2026 IL App (1st) 231184-U

No. 1-23-1184

Order filed July 9, 2026

FOURTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 0548103 |
| | ) | |
| JONATHON OWENS, | ) | Honorable |
| | ) | Steven Jay Rosenblum, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Navarro and Justice Quish concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's first degree murder conviction finding that a rational juror could have found the State disproved his self-defense and second degree murder claims beyond a reasonable doubt, the court properly admitted a statement under the coconspirator hearsay exception, and his sentence is not excessive.

¶ 2    The defendant-appellant, Jonathon Owens, appeals from his conviction of first degree murder for the death of David Chikerotis. On June 29, 2023, Mr. Owens was sentenced by the circuit court to 40 years' imprisonment. On appeal, Mr. Owens argues that: 1) his conviction

should be reversed because the State did not disprove beyond a reasonable doubt that he was justified in using force to defend himself and his friends from Mr. Chikerotis; 2) his conviction should be reduced to second degree murder due to imperfect self-defense; 3) his conviction should be reversed because the circuit court improperly admitted hearsay and the error was not harmless; and 4) his sentence was excessive. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4      Mr. Owens, Jessica Doherty, and Stacy Krisik were charged by grand jury indictment with 15 counts, including first degree murder, for the beating death of Mr. Chikerotis that occurred between the evening of March 22, 2019, and the morning of March 23, 2019. Ms. Doherty pleaded guilty to first degree murder in exchange for a 20-year sentence. Ms. Krisik pleaded guilty to conspiracy to commit first degree murder in exchange for a 12-year sentence served at 50% that was conditioned on her testifying against Mr. Owens.

¶ 5                                    Jury Trial

¶ 6      Mr. Owens elected to have a jury trial, which began on October 13, 2022. The State proceeded on counts VI and VII. Count VI was first degree murder with intent to kill or injure and count VII was first degree murder with strong probability to kill or injure. Counts I through V and VIII through XV were *nolle prosequi*.

¶ 7      On the evening of March 22, 2019, there was gathering at Mr. Owens' and Ms. Krisik's house in Evergreen Park, Illinois, that included Mr. Owens, Ms. Krisik, Ms. Doherty, Mr. Chikerotis, Mandi Fields, Julius Adames, and Holli Soper. In the jury trial, Ms. Soper, Mr. Adames, and Ms. Krisik testified for the State, while Mr. Owens and Ms. Fields testified for the defense.

¶ 8    On the night of March 22, 2019, through the morning of March 23, 2019, the group of seven were hanging out at Mr. Owens' and Ms. Krisik's home at 8729 South Francisco Avenue, Evergreen Park, Illinois.

¶ 9    Ms. Krisik testified that on the evening of March 22, 2019, she and Mr. Owens had been dating for about four to five months. Ms. Fields had been in a romantic relationship with Mr. Chikerotis for about seven months at that point. Mr. Owens had been best friends with Ms. Fields' deceased older brother, and Mr. Owens and Ms. Fields considered each other like brother and sister. The four of them hung out frequently. Ms. Krisik, Mr. Owens, and Ms. Fields testified the four of them saw each other at least every weekend.

¶ 10    Every witness that was at the gathering on March 22, 2019, through March 23, 2019, testified that all seven of them were consuming alcohol and cocaine and playing cards. Ms. Krisik supplied the gathering with cocaine, but Mr. Chikerotis also had his own stash of cocaine and was consuming more than anyone else.

¶ 11    Mr. Owens testified that at some point in the night Mr. Chikerotis' demeanor changed and people started asking him if everything was okay. Mr. Chikerotis starting muttering things that did not make sense like mentioning the mayor, swearing and saying "they know" repeatedly. He started grabbing at his throat and Ms. Krisik asked if he needed anything to drink, but Mr. Chikerotis did not respond.

¶ 12    While they were sitting at the dining table, Mr. Chikerotis pulled out a pocketknife. Ms. Krisik, Ms. Fields, and Mr. Owens testified that Mr. Chikerotis always carried a knife with him. Ms. Soper testified that when she saw the knife, she told everyone at the table that Mr. Chikerotis had it. Mr. Owens asked Mr. Chikerotis why he had the knife out, and Mr. Chikerotis said he felt like Ms. Doherty was setting him up. Mr. Chikerotis grabbed Ms. Fields up by her shoulder and

started waving the knife around. Mr. Owens and Ms. Fields testified that Mr. Chikerotis put the knife to Ms. Fields' throat. Multiple people told Mr. Chikerotis to put the knife away. Mr. Owens tried to grab the knife from Mr. Chikerotis, and they started struggling against each other. Mr. Owens managed to get the knife away from Mr. Chikerotis, but Mr. Owens' hand got cut in the process. Ms. Fields testified she then grabbed the knife and put it in her waistband.

¶ 13    Mr. Chikerotis calmed down and consumed more cocaine, and everyone returned to the dining table. Sometime later, Mr. Chikerotis grabbed a bar stool and started swinging it around. Mr. Owens took the bar stool from him and Mr. Adames tried to talk to him to calm him down. Mr. Chikerotis punched Mr. Adames in the face causing Mr. Adames' lip to bleed. Mr. Adames punched Mr. Chikerotis back a few times. Mr. Owens intervened at some point and started exchanging punches with Mr. Chikerotis. Eventually, Mr. Chikerotis calmed down and ingested more cocaine.

¶ 14    Ms. Krisik testified that Mr. Chikerotis later grabbed another bar stool and started swinging it at the walls, windows, and sliding glass doors in the dining room. According to Ms. Krisik, Mr. Owens got the stool away from Mr. Chikerotis and they started fighting again. Ms. Soper testified that Mr. Chikerotis grabbed the knife he had earlier from the dining table and pointed it at Mr. Owens. Mr. Owens pushed the table away from everyone and started fighting with Mr. Chikerotis again.

¶ 15    Eventually, Ms. Doherty and Ms. Krisik joined the fight and Mr. Owens and Mr. Chikerotis fell to the floor while fighting. Ms. Soper and Mr. Adames testified that Ms. Doherty and Ms. Krisik held down Mr. Chikerotis while Mr. Owens was on top of him, hitting him. Ms. Krisik testified that Ms. Doherty held Mr. Chikerotis' legs while Mr. Owens was on top of him, punching him. Ms. Krisik said she cursed at and kicked Mr. Chikerotis while he was on the ground because

she was upset with him for messing up her house. Ms. Krisik stated that Mr. Chikerotis eventually became unconscious and that his head looked like a "football head." Ms. Krisik left to use the bathroom, and she testified that when she returned, Mr. Chikerotis was getting back up.

¶ 16    Mr. Owens testified that at some point Mr. Chikerotis pushed Ms. Krisik and smacked Ms. Doherty and that Ms. Doherty punched Mr. Chikerotis multiple times. Detective Sergeant Joseph Malloy testified that Ms. Soper told him Mr. Chikerotis cut Mr. Owens' hand and punched Ms. Doherty in the face. Ms. Soper also told Detective Malloy that Mr. Chikerotis picked up a chair and was trying to break a window.

¶ 17    Ms. Soper testified that she noticed Mr. Chikerotis bleeding heavily from his face and told the group they should get him some help. At some point, Ms. Soper grabbed washcloths and ice for Mr. Adames and Mr. Chikerotis. She gave one to Mr. Adames and tried to give one to Mr. Chikerotis but "was told no" by the others. Ms. Soper also testified that there was a break in the fighting for people to smoke some marijuana and that Mr. Chikerotis tried to run to the back door, but it was locked. Ms. Soper stated that Mr. Owens grabbed Mr. Chikerotis and threw him on the floor and Mr. Owens, Ms. Krisik, and Ms. Doherty attacked him again. Mr. Adames and Ms. Fields testified that Mr. Chikerotis never tried to leave the house and that no one tried to stop Mr. Chikerotis from leaving.

¶ 18    Ms. Fields testified that Mr. Chikerotis would sometimes take Xanax to calm down from the effects of cocaine, so she crushed some up and tried to give some to Mr. Chikerotis who spit the drugs out.

¶ 19    Ms. Krisik and Mr. Owens testified that Mr. Chikerotis later grabbed an empty bottle of Mike's Hard Lemonade and started swinging it around. Ms. Fields stated she was trying to clean the blood from Mr. Chikerotis' nose when he grabbed the bottle. Mr. Adames and Ms. Fields

testified that Mr. Chikerotis threatened Ms. Fields with the bottle. Ms. Fields stated that Mr. Chikerotis started screaming things that did not make sense again like that he knew the mayor and that Ms. Fields was going to kill him with a gun, however there was no gun. Mr. Owens tried to get the bottle from Mr. Chikerotis and the two exchanged more blows.

¶ 20    Mr. Owens and Mr. Chikerotis did start fighting again and fell to the floor again. Mr. Owens testified that he told Mr. Chikerotis that they were either going to call the police or his family and Mr. Chikerotis said to call his family. Ms. Soper testified that Mr. Chikerotis yelled out that Mr. Owens, Ms. Doherty, and Ms. Krisik were going to kill him and then asked Ms. Fields to call his brother.

¶ 21    Ms. Fields managed to get Mr. Chikerotis' cellphone and tried to call his brother, Luke Chikerotis (Luke). Mr. Chikerotis gave the wrong passcode to unlock his phone, at first. Ms. Fields and Mr. Owens testified that Mr. Owens pushed Mr. Chikerotis' head to the ground until he gave the correct passcode. Ms. Soper testified that Mr. Owens hit Mr. Chikerotis several times until he gave the correct passcode.

¶ 22    Luke testified that he received a call around 8:30 a.m. on March 23, 2019, from Mr. Chikerotis' phone. Ms. Fields was on the other line and told Luke to come get his brother. Luke asked why and if his brother was okay. Luke became concerned over the course of the conversation and told Ms. Fields to call the police. Ms. Fields put Luke on speaker phone and Mr. Chikerotis yelled "Luke, don't come here. It's a trap." Mr. Adames testified that Mr. Chikerotis yelled "don't come here. They're going to kill you." Ms. Fields testified that Ms. Doherty kicked Mr. Chikerotis in response and Mr. Owens yelled at her to stop, but Ms. Doherty hit Mr. Chikerotis a few times. Luke could tell Mr. Chikerotis sounded bad, like he was concussed. Someone eventually gave Luke the address and Luke immediately called 9-1-1 and told them his brother was hurt badly at

the house in Evergreen Park. Luke then got in his car and drove to Mr. Owens' and Ms. Krisik's house.

¶ 23    Mr. Adames left the house and testified that when he was leaving, Mr. Chikerotis was breathing heavily and his head looked like a pumpkin. The only person Mr. Adames saw punch Mr. Chikerotis in the face was Mr. Owens.

¶ 24    Ms. Krisik testified that when the incident was over, Mr. Chikerotis was bleeding all over his head and that there was blood all over the dining room's floors and walls. Ms. Doherty and Ms. Krisik tried to clean up the dining room and the blood, then the Evergreen Park Police Department officers arrived.

¶ 25    The police officers responded to 8729 South Francisco Avenue for a wellbeing check. It took them about 1-2 minutes to get to the house after receiving the call from Luke. When the officers arrived, Officer David Phillips knocked on the door and Ms. Krisik answered. She let the officers inside and Officer Phillips saw a male, later identified as Mr. Chikerotis, "laying face down on the kitchen floor, like a pool of blood around his head." Officer Phillips bent down near Mr. Chikerotis to see if he might be conscious, but Mr. Chikerotis was unresponsive and making gargling noises. His head had numerous injuries and was bleeding.

¶ 26    Officer Thomas Lehnhardt talked to Ms. Fields and asked her who had done it and she responded that her brother had done it. Ms. Fields' biological brother had died previously. However, Ms. Fields and Mr. Owens sometimes referred to each other as sister and brother.

¶ 27    Two of the officers went to the second floor of the house where they found Mr. Owens in one of the bedrooms, lying in bed under the covers in casual clothes with his shoes on. One of the officers observed that Mr. Owens "had swollen knuckles on both hands" and "had blood on his hat, shirt, pants, and shoes."

¶ 28     Paramedics eventually arrived. A paramedic who was on the scene testified that the "patient was on the floor unresponsive to verbal or painful stimuli, breathing, but, again, not responding." According to the paramedic, Mr. Chikerotis was facedown and the pool of blood was an indicator of some type of laceration or trauma. Mr. Chikerotis was also breathing at a rate that was okay, but in a manner that was not sufficient. The paramedics "delivered bag valve mask oxygenation in a manner of assisting the patient's ventilation." The paramedics placed a collar used to protect the cervical spine on Mr. Chikerotis.

¶ 29     When Luke arrived, his brother, Mr. Chikerotis, was in the ambulance. A paramedic who knew the Chikerotis family from childhood told Luke to call his family and get to the hospital.

¶ 30     Mr. Owens, Ms. Fields, Ms. Krisik, Ms. Doherty, and Ms. Soper were taken to the Evergreen Park police station. Mr. Adames was also called to the police station later. Detective John Murphy testified that at the police station he observed that Mr. Owens had redness on his forehead, abrasions on the inside of his lip and on his left hand, bruising on his ankles, and blood all over his clothes and that Ms. Doherty had bruising on her hands, wrists, and right arm. Detective Murphy also observed that Mr. Chikerotis' hands and knuckles had swelling in the hospital.

¶ 31     Dr. Ellen Omi, a trauma surgeon, critical care doctor, and acute care surgeon at Advocate Christ Medical Center (Advocate), cared for Mr. Chikerotis when he was brought in the morning of March 23, 2019. When the paramedics brought Mr. Chikerotis into the emergency department, he was on a backboard and had a collar on. The trauma team that Dr. Omi was a part of put Mr. Chikerotis on a ventilator. He was largely unresponsive and did not have any verbal or motor response or eye movement.

¶ 32     The trauma team ordered lab tests and discovered Mr. Chikerotis' kidney was not functioning properly. The team also ran a Computed Tomography (CT) scan. The CT scan

revealed Mr. Chikerotis had swelling all over the brain and face, a blood clot "between the brain and a layer on the brain that is called the dura," a broken nose, and lacerations on his face.

¶ 33    Mr. Chikerotis underwent a craniectomy, a surgery to relieve pressure in the brain from the blood and swelling. After the surgery, Mr. Chikerotis was taken to Advocate's Surgical and Trauma Intensive Care Unit, where he stayed for two days before passing away.

¶ 34    Dr. Emily Hansen, an assistant medical examiner at the Cook County Medical Examiner's Office, performed an autopsy or a post-mortem examination on the remains of Mr. Chikerotis on March 28th, 2019, at about 8:45 in the morning. Mr. Chikerotis had multiple blunt force injuries on his head and neck, a swollen brain, a broken nose and left cheekbone, and bruising on various parts of his body. He had no signs of disease. Dr. Hansen testified that the cause of death was "blunt force injuries of the head due to assault" and that the manner of death was "homicide."

¶ 35    Dr. James O'Donnell, an expert for the defense, testified that the cocaine Mr. Chikerotis ingested was "measured at levels that are associated with a high degree of paranoia, violence, aggression, altered mental state, and other psychiatric disturbances." Additionally, Dr. O'Donnell testified that the Suboxone Mr. Chikerotis had ingested "does not contribute to the cocaine aggressiveness and violence, but it contributes to a clouded sensorium or clouded mental state. It is disinhibiting. So[,] it's a different form of loss of control."

¶ 36    At the close of evidence, the jury received self-defense, defense of others, and second degree murder instructions. The jury found Mr. Owens guilty of first degree murder. Additionally, it found that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 37    On November 14, 2022, and December 15, 2022, Mr. Owens filed a motion for a judgment of acquittal or alternatively a new trial. On June 29, 2023, Mr. Owens filed an amended motion for judgment of acquittal or alternatively a new trial, which the trial court denied that same day.

¶ 38                                Sentencing

¶ 39    On June 29, 2023, Mr. Owens' sentencing hearing was held. The parties stipulated that a video interview of Ms. Doherty would show her admitting to hitting Mr. Chikerotis more than 500 times.

¶ 40    After hearing arguments in aggravation and mitigation, the trial court sentenced Mr. Owens to 40 years of imprisonment, merging counts VI and VII. The trial court rejected the opportunity to impose an extended term allowed by the jury's finding that the crime was accompanied by brutal and heinous behavior indicative of wanton cruelty based on consideration of factors presented in mitigation.

¶ 41    Mr. Owens filed a motion to reconsider sentence on June 29, 2023, which the trial court denied that same day. Mr. Owens filed his notice of appeal that day.

¶ 42                                ANALYSIS

¶ 43    We note that we have jurisdiction to consider this matter, as Mr. Owens filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. Mar. 12, 2021).

¶ 44    On appeal, Mr. Owens argues that 1) his first degree murder conviction should be reversed because the State did not disprove beyond a reasonable doubt that he was justified in using force to defend himself and his friends from Mr. Chikerotis or alternatively his conviction should be reduced to second degree murder, 2) his conviction should be reversed because the circuit court improperly admitted Ms. Doherty's statement to Ms. Soper and the error was not harmless, and 3) his sentence is excessive and should be reduced or his case remanded for a new sentencing.

¶ 45                                    Self-Defense

¶ 46    First, Mr. Owens contends that because the State's own evidence did not disprove that he was justified in using force in self-defense and defense of others, this court should reverse his first degree murder conviction.

¶ 47    Generally, in assessing the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Hooker*, 249 Ill. App. 3d 394, 400 (1993). The conviction will only be overturned if the evidence is "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Hooker*, 249 Ill. App. 3d at 400.

¶ 48    Self-defense is an affirmative defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). Once a defendant has raised the issue of self-defense, the burden is on the State to disprove it beyond a reasonable doubt in addition to proving each element of the charged offense. *Id.* The elements of self-defense are that 1) force was threatened against the defendant; 2) the defendant was not the aggressor; 3) the danger of harm was imminent; 4) the force threatened was unlawful; 5) the defendant actually believed that a danger existed, the use of force was necessary to avert the danger, and the kind and amount of force actually used was necessary; and 6) the defendant's beliefs were reasonable. *People v. Heintz*, 2026 IL 131340, ¶ 53. If the State negates any element of the self-defense claim, then the defendant's claim must fail. *Lee*, 213 Ill. 2d at 225.

¶ 49    The standard of review then, is whether after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.*

¶ 50    Self-defense is a question of fact that must be determined by the trier of fact. *Hooker*, 249 Ill. App. 3d at 400. In particular, the reasonableness of a defendant's belief that the use of deadly force was justified is a question of fact. *Id.* Accordingly, it is the jury's function to assess the credibility of the witnesses, weigh the testimony, draw inferences from the evidence, and resolve conflict or inconsistencies in the evidence. *Lee*, 213 Ill. 2d at 225. A reviewing court "will not substitute its judgment for the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Bradford*, 2016 IL 118674, ¶ 12. It is not the role of a reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence. *Hooker*, 249 Ill. App. 3d at 400-01.

¶ 51    Mr. Owens cites *People v. Brackett*, 117 Ill. 2d 170, 180 (1987), for the proposition that "death is not ordinarily contemplated as a natural consequence of blows from bare fists." In *People v. Nibbe*, the court found that the principle was applicable where the defendant struck the victim in the face with one blow from his bare fist and the victim fell to the ground and hit his head on the concrete, which killed him. *People v. Nibbe*, 2016 IL App (4th) 140363, ¶ 34. In another case in which the principle was found applicable, a defendant got into a physical altercation with his father that led to the father being brought to a hospital where he died two days later after a stroke. *People v. Lengyel*, 2015 IL App (1st) 131022, ¶ 6. The court noted that the physical altercation lasted a matter of minutes as opposed to an hours-long beating, and that the defendant stopped punching as soon as he saw blood. *Id.* ¶ 53.

¶ 52    However, other Illinois courts have recognized exceptions to the principle. *Nibbe*, 2016 IL App (4th) 140363, ¶ 28. In *People v. Gresham,* 78 Ill. App. 3d 1003, 1007 (1979), the court recognized that striking an individual with fists resulting in that individual's death may be murder. Similarly, in *People v. Freeman*, 78 Ill. App. 2d 242, 246, 254 (1966), the court found that the

State's evidence was sufficient to sustain the defendant's murder conviction where the pathologist testified the victim's death was "caused by a beating that could have been done by a human hand." Notably, even in *Brackett*, the court found the principle inapplicable where there was great disparity in size and strength between the defendant and the victim. *Brackett*, 117 Ill. 2d at 180.

¶ 53    In this case, multiple witnesses at the Evergreen Park gathering testified that Mr. Owens hit Mr. Chikerotis multiple times over several hours between the night of March 22, 2019, and the morning of March 23, 2019. Mr. Adames testified that he only saw Mr. Chikerotis get punched in the face by Mr. Owens. Ms. Krisik and Ms. Soper testified that Mr. Owens was hitting Mr. Chikerotis while Mr. Chikerotis was being restrained and unable to fight back. Ms. Krisik also stated that Mr. Chikerotis appeared unconscious at one point due to the beating.

¶ 54    Unlike the cases where the principle was applicable, the altercation between Mr. Owens and Mr. Chikerotis did not last mere minutes or consist of a single punch, but lasted hours and consisted of a large number of punches. The altercation did not stop after blood was spilled and no one testified to any outside causes that could have led to Mr. Chikerotis' death other than the blows he received from some of the people at the gathering. Therefore, we find the principle that "death is not ordinarily contemplated as a natural consequence of blows from bare fists" does not apply in this case.

¶ 55    While some witnesses claimed that Mr. Chikerotis threatened Ms. Fields with the knife and glass bottle, others testified that Mr. Chikerotis swung the objects around but not necessarily at anyone specifically. No one testified that Mr. Chikerotis actually hit anyone with the bar stools or the bottle. Additionally, witnesses described Mr. Chikerotis' head after the beating as a "pumpkin" or "football" head. Mr. Chikerotis' blood was splattered all around the floors and walls of the dining room and the police officers found him in a pool of his blood when they arrived. Therefore,

a jury could have found that the State disproved one or more of the elements of self-defense, such as whether the kind and amount of force actually used was unnecessary or if Mr. Owens' belief in the need for the use of force was unreasonable.

¶ 56 "The right of self-defense does not justify an act of retaliation or revenge." *People v. Woods*, 81 Ill. 2d 537, 543 (1980). The right of self-defense is to protect the person, not their pride. *Id.* For example, in *People v. Tirrell*, 87 Ill. App. 3d 511 (1980), the court found that the defendant had not acted in self-defense, even though the victim had initiated the altercation, because he and his brothers continued to beat and kick the victim when he was on the ground and could no longer cause harm. *People v. Tirrell*, 87 Ill. App. 3d 511, 517 (1980).

¶ 57 Multiple witnesses testified that Mr. Owens continued to punch Mr. Chikerotis while he was being held down by Ms. Doherty and Ms. Krisik. Mr. Chikerotis' head injuries were so excessive that he had swelling and bleeding in the brain. Mr. Owens and the others at the gathering had far less injuries in comparison. Given the witness testimony and other evidence presented at trial, we find that a jury could have rationally found that Mr. Owens was not acting in self-defense or defense of others, even if Mr. Chikerotis was the initial aggressor.

¶ 58 Thus, after reviewing all of the evidence of self-defense presented by Mr. Owens in this case, we conclude that a rational trier of fact could have found that Mr. Owens' belief that the use of deadly force was necessary was unreasonable. The jury's verdict is not so improbable or unsatisfactory that it creates a reasonable doubt. *Id.*

¶ 59                                        Second Degree Murder

¶ 60 Alternatively, Mr. Owens argues that he established that he had an unreasonable belief in the need for self-defense and the defense of others and the State did not prove absence of this

unreasonable belief as a mitigating factor, so his conviction should be reduced to second degree murder.

¶ 61    Second degree murder is a lesser mitigated offense of first degree murder in Illinois. *People v. Castejon*, 2025 IL App (1st) 221918, ¶ 16. A person commits the offense of second degree murder when they commit the offense of first degree murder and at the time of the killing they believe the circumstances to be such that, if they existed, would justify or exonerate the killing but this belief is unreasonable. 720 ILCS 5/9-2(a)(2) (West 2018); *Hooker*, 249 Ill. App. 3d at 403.

¶ 62    To prove second degree murder, the State must first prove beyond a reasonable doubt that a defendant committed first degree murder. *Castejon*, 2025 IL App (1st) 221918, ¶ 16. Then, a defendant must prove that one of the mitigating factors for second degree murder was present— either a serious provocation or an unreasonable belief in the need for self-defense—by a preponderance of the evidence. 720 ILCS 5/9-2(a)(1)-(2), (c) (West 2018); *Castejon*, 2025 IL App (1st) 221918, ¶ 16.

¶ 63    The standard of review in this context is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). The presence of a mitigating factor is a question of fact, and we reiterate that our function on review is not to reweigh the evidence or substitute our judgment for that of the jury. *Castejon*, 2025 IL App (1st) 221918, ¶ 18. Additionally, a jury need not find the defendant credible. *Id.*

¶ 64    Under Supreme Court Rule 615(b)(3), a reviewing court has the power to reduce the degree of the offense the defendant was convicted of. Ill. S. Ct. R. 615(b)(3); *Hooker*, 249 Ill. App. 3d at 403. However, this power should be used on rare occasions and with extreme caution. *Hooker*, 249 Ill. App. 3d at 403. In particular, reducing a conviction of first degree murder to second degree

murder should be "cautiously exercised." *Id.* The power to reduce the defendant's conviction to second degree is available where there is an evidentiary weakness with regard to an element of the first degree murder charge and where the trial judge has expressed dissatisfaction with imposing the mandatory minimum sentence. *Id.*

¶ 65    In this case, viewing the evidence in the light most favorable to the prosecution, a jury could have found that the mitigating factor was not present. There was testimony that Mr. Owens, Ms. Doherty, and Ms. Krisik, restrained, punched, and kicked Mr. Chikerotis multiple times. Ms. Soper testified that Mr. Chikerotis tried to run to the back door of the home and Mr. Owens grabbed him and continued beating him. Ms. Soper also testified that when Ms. Fields was trying to unlock Mr. Chikerotis' phone to call his brother, Mr. Owens punched Mr. Chikerotis until he gave the correct passcode.

¶ 66    Mr. Owens and the other witnesses had fewer injuries and those were relatively minor compared to Mr. Chikerotis'. The jury's conclusion that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty even further undermines a second degree murder claim.

¶ 67    Additionally, the record does not indicate any hesitation from the trial court in imposing a sentence within the mandatory range as the trial court sentenced Mr. Owens to 20 years over the statutory minimum. See *Id.* Therefore, we find that Mr. Owens' conviction for first degree murder should not be reduced to second degree murder.

¶ 68                                    Hearsay Statement

¶ 69    Next, Mr. Owens contends that the trial court erred when it admitted a hearsay statement made by non-testifying co-defendant, Ms. Doherty, because it did not fall within the coconspirator exception to the hearsay rule where the statement was not made in furtherance of any conspiracy,

and it was inadmissible under the state-of-mind exception to the hearsay rule because it was irrelevant.

¶ 70    At trial, Ms. Soper testified that while she was at the police station in an investigation room, she could see Ms. Doherty in a room directly across from her. Over defense counsel's objections, the trial court allowed Ms. Soper to testify that Ms. Doherty threatened Ms. Soper and said "that she was going to put her hands on [her]" because Ms. Doherty had discovered Ms. Soper was telling the truth to the police about what happened.

¶ 71    Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 38. Unless a hearsay statement falls within an exception, it is generally inadmissible. *Caraga*, 2018 IL App (1st) 170123, ¶ 38.

¶ 72    The admission of evidence by the trial court is reviewed for an abuse of discretion. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 64. An abuse of discretion occurs when the trial court's decision was "arbitrary or unreasonable to the degree that no reasonable person would adopt the same view." *Id.*

¶ 73    On appeal, the State has conceded that Ms. Doherty's statement to Ms. Soper was not admissible under the state-of-mind exception to the hearsay rule.

¶ 74    Mr. Owens contends that Ms. Doherty's statement was wrongly admitted under the coconspirator hearsay exception because it was not made in furtherance of or to conceal the conspiracy to commit first degree murder. The conspiracy had ended, Mr. Owens argues, and he and Ms. Doherty had already been detained.

¶ 75    Under the Illinois Rules of Evidence, a statement is not hearsay if the statement is offered against a party and the statement is by a coconspirator of the party during the course and in

furtherance of the conspiracy. Ill. R. Evid. 801(d)(2)(E); *People v. Thomas*, 178 Ill. 2d 215, 237-38 (1997). The exception allows statements made during the course of and in furtherance of the conspiracy to be admitted against the declarant and coconspirators upon a *prima facie* showing of a conspiracy. *People v. Parmly*, 117 Ill. 2d 386, 393 (1987).

¶ 76     A coconspirator's statement is not considered hearsay because the statement is offered to show the existence and object of a conspiracy, and not for the truth of the matter asserted. *Caraga*, 2018 IL App (1st) 170123, ¶ 38. Thus, for a statement to fit within this exception, it must further the conspiracy or contribute to the achievement of the conspiracy's objective. *Id.*

¶ 77     Claiming that the conspiracy had ended, Mr. Owens argues that Ms. Doherty's threat to Ms. Soper was "self-serving and attempted to minimize her culpability" and did not have the effect of advising, encouraging, aiding or abetting the conspiracy's perpetration.

¶ 78     Statements made in furtherance of the objective of the conspiracy include statements related to attempts at concealment and escaping punishment. *People v. Kliner*, 185 Ill. 2d 81, 141 (1998). Therefore, statements made after the fact to conceal the offense, when sufficiently proximate in time to the offense, are admissible under the coconspirator hearsay exception. *Id.*; *People v. Pace*, 225 Ill. App. 3d 415, 430 (1992).

¶ 79     In *People v. Kliner*, the Illinois Supreme Court concluded that the trial court properly admitted statements by a coconspirator that were made several hours after the murder. *Kliner*, 185 Ill. 2d at 141. One of the defendant's coconspirators, Joseph Rinaldi, testified that in a conversation between him and another coconspirator, Michael Permanian, Mr. Rinaldi told Mr. Permanian that he told the police Mr. Permanian drove a red sports car because the original plan was to use a stolen car. *Id.* at 139-40. Upset, Mr. Permanian told Mr. Rinaldi that he and the defendant had used Mr. Permanian's red car during the murder and it was in the news. *Id.* at 140. The court found that

Mr. Permanian's statements were made proximately in time to the murder and that they were attempts at concealing the conspiracy by encouraging Mr. Rinaldi to not reveal further information to the police. *Id.* at 141-42.

¶ 80    Here, Ms. Doherty's threat to Ms. Soper in response to discovering that Ms. Soper was telling the police officers what happened at the gathering was an attempt to encourage Ms. Soper to not disclose more information to the police. Like the statements of the coconspirator in *Kliner*, Ms. Doherty's statements constitute an attempt at concealing the conspiracy. We therefore find that the trial court properly admitted Ms. Doherty's statement to Ms. Soper under the coconspirator exception.

¶ 81                                    Sentencing

¶ 82    Finally, Mr. Owens argues that his 40-year sentence is excessive and should be reduced or the case should be remanded for resentencing. Mr. Owens claims that the State's evidence demonstrated that he acted only after strong provocation and that the trial court did not give adequate weight to the mitigating evidence, such as Mr. Owens' minimal prior criminal history and his significant health issues due to being an amputee.

¶ 83    A judge's sentencing decision is given substantial weight and deference. *People v. Center*, 198 Ill. App. 3d 1025, 1032 (1990). The sentencing judge is in a superior position to consider the matters related to a sentencing determination and is allowed "wide discretion in making a reasoned judgment as to the penalty appropriate to the particular circumstances of each case." *Id.*

¶ 84    A judge's discretion is not unlimited, however. *Id.* Supreme Court Rule 615(b)(4) empowers a reviewing court to reduce a sentence imposed by the trial court. Ill. S. Ct. R. 615(b)(4); *Center*, 198 Ill. App. 3d at 1032. However, a sentence will not be disturbed on appeal absent an abuse of discretion by the trial court. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). This is

because the trial court is in a better position to consider "the credibility, demeanor, general moral character, mentality, social environment, habits and age of the defendant" amongst other considerations. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). However, an abuse of discretion may be found if the sentence "is greatly at variance with the purpose and spirit of the law," even where the sentence is within the statutory limits. *Id.*

¶ 85    Under the Illinois Constitution, penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *Quintana*, 332 Ill. App. 3d at 109. In evaluating the appropriate sentence, a trial court must thoughtfully consider all factors in aggravation and in mitigation. *Calhoun*, 404 Ill. App. 3d at 385. "The seriousness of the crime is the most important factor in determining an appropriate sentence." *Quintana*, 332 Ill. App. 3d at 109.

¶ 86    A trial judge must consider several factors in mitigation, including whether the defendant "acted under a strong provocation" or whether there were "substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." 730 ILCS 5/5-5-3.1(a) (West 2022); *Calhoun*, 404 Ill. App. 3d at 386. Strong provocation is not defined under the Unified Code of Corrections, but the similar term "serious provocation," has an established definition under Illinois law. *Calhoun*, 404 Ill. App. 3d at 386.

¶ 87    Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b). The categories of serious provocation that are sufficient to reduce the offense of first degree murder to second degree under Illinois law are: "substantial physical injury or assault, mutual quarrel or combat, illegal arrest and spousal adultery." *Calhoun*, 404 Ill. App. 3d at 387. However, strong provocation as a mitigating factor at sentencing

encompasses a larger range of conduct than serious provocation does under the second degree murder statute. *People v. Merritte*, 242 Ill. App. 3d 485, 492-93 (1993).

¶ 88    Mr. Owens argues that the trial court's comments show that it did not consider Mr. Chikerotis' actions as a factor in mitigation and that the court dismissed Mr. Chikerotis' role in the events that occurred when it noted that the "knife was gone in 20 seconds."

¶ 89    A reviewing court presumes that the sentencing court only considered appropriate factors in sentencing, unless the record expressly demonstrates the contrary. *Quintana*, 332 Ill. App. 3d at 109. The sentencing judge is not required to explain the exact process with which they determined the sentence or to specifically express their consideration of mitigating factors. *Id.* When determining whether a sentence was proper, a reviewing court should not focus on a couple isolated words or phrases, but must consider the record as a whole. *Merritte*, 242 Ill. App. 3d at 494.

¶ 90    Mr. Owens cites *People v. Calhoun*, 404 Ill. App. 3d 362 (2010), in which this court remanded for a new sentencing after the trial court imposed a maximum term of 60 years' imprisonment for first degree murder. We find *Calhoun* is distinct from this case in several ways.

¶ 91    In *Calhoun*, this court noted the defendant had no prior history of violence and "her record reflect[ed] only two minor offenses: (1) for drinking as a minor and (2) for possession of cannabis, for both of which she received supervision." *Calhoun*, 404 Ill. App. 3d at 374. Mr. Owens, however, had multiple convictions for violent offenses in his criminal history, including battery, and a felony conviction.

¶ 92    In *Calhoun*, the defendant participated in the first degree murder of someone who had apparently sexually assaulted her infant daughter. *Id.* at 386. This court found that instead of focusing on the "undeniably egregious nature of the provocation," the trial court chose to instead

focus on the defendant's actions as vigilantism which it used to justify a higher punishment. *Id.* at 387. This court stated that:

> "[I]n imposing these penalties the trial judge is nevertheless under a duty to consider the fact that the vigilante justice taken was neither casual nor random but rather committed in response to provocation that objectively would be as extreme as any mother of any child could sustain." *Id.* 387-88.

¶ 93 A review of the record in this case shows that the trial judge expressly considered that Mr. Owens was provoked by Mr. Chikerotis' behavior and refused to give Mr. Owens an extended term precisely because of that consideration, finding that there should be a difference between when the victim plays a role and when he does not.

¶ 94 Mr. Owens also points to the fact that codefendant, Ms. Doherty, was sentenced to 20 years in prison in exchange for her guilty plea even though she admitted to hitting Mr. Chikerotis more than 500 times, to argue that Mr. Owens' 40-year sentence shows that the court failed to consider the mitigating factors and Mr. Owens' rehabilitative potential.

¶ 95 While defendants who are similarly situated should not receive greatly disparate sentences, differences in sentences may be appropriate depending on the "relative character and history of the co-defendants, the degree of culpability, rehabilitative potential or a more serious criminal record." *Merritte*, 242 Ill. App. 3d at 495. Mr. Owens has multiple convictions for violent offenses and all of the trial witnesses who were at the gathering in Evergreen Park described Mr. Owens as being the primary person fighting with and punching Mr. Chikerotis.

¶ 96 The sentencing range for Mr. Owens' conviction was between 20 and 60 years and he was subject to a potential extended-term sentence due to the jury's finding that the murder was

accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court sentenced Mr. Owens to 40 years' imprisonment and declined to add an extended-term.

¶ 97    The record shows that the trial court considered the presentence investigation report, statements from friends and family of both Mr. Owens and Mr. Chikerotis, and the factors in both mitigation and aggravation. As such, we conclude that the trial court did not abuse its discretion when it sentenced Mr. Owens to 40 years' imprisonment.

¶ 98                                  CONCLUSION

¶ 99    For the reasons set forth above, we affirm the judgment of the circuit court.

¶ 100   Affirmed.